Thank you, Your Honor. George Peeler v. Sean Alexander. I'm getting a little bit of an echo here. I hope it's not echoing to the Court. It's just a little bit, but we can hear you well, I think. Thank you. I believe I've set forth my position adequately and well in the briefing, and there's only so many ways I can think of to say that what the government proved here just doesn't constitute a regular course of trade in dealing in firearms. We have just four transactions in approximately a six-month period, and the government had plenty of access to Mr. Alexander's phone records and so forth, and they produced no evidence of any other activity by him in dealing in firearms. And so we have a statute that sets forth a requirement of proving a regular course of trade or business. And as I say, I just don't think that has been... Well, I wanted to ask you a question about that. So in your view, is there a minimum number of transactions during a minimum time period that would establish a regular course? The cases aren't particularly helpful in saying, well, six transactions in four months would be fine, four is not enough. So how do we figure out what the dividing line here is? Well, I'm not sure. I'm just concerned that the Court recognized it's got to be someplace other than here. We've got a man who over a six-month period was basically capitalized on participating in four transactions, capitalized on something that other people brought to him, but there's no indication that other than in those four transactions he had anything to do with selling firearms. So at whatever regular course of conduct, I think we all have a feeling for what that would mean, to be engaged in a regular course of trade or business. This just doesn't constitute that. So he has two transactions in late December, and then he takes, what, four months off, and then four to five months off, and then he has a transaction in April and a transaction in May. And that's the end of it. But why is that not just a jury question, then? It sounds like a factual dispute. Well, I don't think it is a jury question in the first instance, of course, but I believe in order to be faithful to the text of the statute, the Court has to look at it and say, well, the jury may have been moved by what, just a general hostility to people who engage in firearm sales. But nonetheless, Congress has defined the crime as this, a regular course of trade or business, and we just can't reasonably say that that meets the statutory definition. Mr. Bulick, I have one other question for you on that topic. There's some evidence that Mr. Hilt engaged in some sales during that time period, too. Could a jury conclude that they were in business together, and that as opposed to just Mr. Alexander's transactions, there were a cumulative set of transactions that involved Mr. Hilt and Mr. Alexander? Well, I think the jury could speculate about that. Well, there was evidence. It's not that they could speculate. There was evidence in front of them of these transactions. There was evidence in front of them that at least some of the transactions were joint. So I guess my question is, given that, why couldn't a jury combine those and say the regular course of business was these two guys together selling firearms? Well, again, I just think that that would be speculation. There's no indication of any type of business activity. We don't find Mr. Alexander originating any of the transactions. All of the government's evidence involves other people bringing it to him and then pulling him into it, and then they do others completely without him. And I guess Your Honor is asking, well, why couldn't a jury conclude that because he participated in four and not in the other four or however many it was, the jury could conclude, well, he probably was somewhere in the background of the others. But to me, that's a jury speculating on what might have been done behind the scenes. The government's supposed to prove those facts. Improvements don't amount to a regular course of trade or business. Did you want to give the rest of your time to Ms. Wefald at this point, or do you have more you wanted to say? No, I'll be happy to cede my time to Ms. Wefald. Obviously, if the court has no further questions. Neither of my colleagues have further questions of Mr. Buehler at this point. If we do later, we'll make sure you get time to respond to him. Thank you, Your Honor. Ms. Wefald. Good afternoon. Vernal Wefald on behalf of Francisco Hilt. The first three issues in my opening brief relate to the government's refusal to disclose the identity, the true identity of the informant in this case. And I would like to concentrate on the evidence that was suppressed. And I want to emphasize that when we're talking about the suppression of evidence, we're not talking about documents. We are talking about information, and we're talking about evidence that was in possession of the government. And what was the evidence that was suppressed and that would have made a difference in this case? First, let's start with what the informant's story was. His story was that he moved into this Mona Park neighborhood because it was the only place that he could find on Craigslist. And he was just shocked to find out there was all this crime taking place. So he contacted his handler and said, well, let's start an investigation because I'm so concerned about all these innocent people being hurt. And I want you to call in. It would be nice to clean up the neighborhood. But as the evidence that I discovered when I was appointed to this case and finally knew who the informant really was, that is a completely ridiculously false story. I also want to emphasize that the informant testified that when he moved into this neighborhood, because he found it on Craigslist, the handler, Detective Shear, said, well, are you crazy? Meaning like it's a dangerous neighborhood and so on. But the informant, as it turns out, he was regular. This was his old stomping grounds. He grew up in the area. And within a five minute, one minute, excuse me, one mile away, it's a five minute drive, and he regularly set up people in Nickerson Gardens. And Nickerson Gardens is, it's a pretty wild place. It's the largest public housing project in the west of the Mississippi. It is patrolled by no less than eight LAPD officers on foot 24-7. It is overrun by the Bounty Hunter Bloods. And this informant. Counsel, what document contains all that information pre-trial that could have been turned over by the government? The government certainly could have turned this information over, and I'll tell you why. Detective Shear, who was the LAPD officer that was involved, along with the Detective Makrish in that state case, informant. Detective Shear was deputized as a task force officer with this very same ATF sting operation. He was working with Agents Wozniak and Thompson. And it's important that, is there something, when the informant, I'm sorry. No, we can hear you. Okay, I'm sorry, can you speak up a little bit, I'm sorry. We can hear you. Now I can, yes. Yes. Continue. The informant, his immigration status was suspended during the time of this investigation for a period of time. And Detective, I believe it was Wozniak, testified that it didn't matter that he could no longer work as an ATF agent during that suspension because he was working for LAPD on this very same investigation. But Counsel, you're not quite... Yeah, Judge, maybe, let me try, because I'm interested in the same issue Judge Bumate asked you about. You said at the outset there were documents in possession of the government that contained this suppressed information, if you would, information not turned over. Could you identify the document? There were no documents, apparently, and I'll tell you why. Because the government never bothered to get them. But the government should have gotten them. We're going back a long line of cases in the Ninth Circuit. Let's go back to Bowie versus, or it was Mariano... No, no, before you do, I think one of the problems with appellate judges is we're pretty good on the law but not very good on the facts since you guys tried the cases and we're just looking at the record. So tell me what documents, whether in possession of the government or in possession of the L.A. task force or somebody else, what document do you think should have been turned over to you? The documents that should have been turned over were, let's see, the government had a responsibility, a duty to get all of the transcripts produced and all of the record for the state case where the informant testified, which they could have done. But they basically buried their head in the sand. Weren't the transcripts created after Mr. Hilt's trial? Yes, I got these transcripts, but that's because I now knew who the informant was and the name and docket number of the state case where he testified. And the government did not disclose the name of that case or the docket number until Friday before the trial was to start the following Tuesday. Mr. Rayner, the trial counsel, tried to see what he could get. It was impossible to get any kinds of transcripts in that short of time. Well, they didn't exist at the time, right? I'm sorry? The transcripts didn't exist at the time the trial counsel found out that there was a state proceeding in which the informant had testified, correct? They did not exist. I got them all produced. Well, yes, what happened was Mr. Rayner, after Mr. Hilt was convicted, he contacted the Federal Public Defender's Office because they had a related case. There were lots of cases involved with the same informant. Counsel, are you saying that Brady has a duty to create documents? The government has a duty to create documents under Brady? Is that your argument? No, the government does not have a duty to create documents, but the government has a duty to investigate the credibility of their informant. Now, look at this Mariana vs. Bowie case. That was a case where the defendant, or one of the informants, he was back in the jail cell and they were passing around a letter that said that they were going to frame this defendant. And the government did turn that letter over, but what Judge Trott emphatically condemned the government for not investigating whether or not that was true and reversed the conviction. Any responsible prosecutor has a long-settled duty to investigate the credibility of the informant. We're talking about a criminal informant who worked with these agents and the same LAPD officers on the task force. He testified in a trial a year before this case, and the government did not even disclose that the informant's testimony, which was basically the entire evidence in the case, did not result in a conviction. And in fact, when there was a hung jury, the state judge decided to grant the motion to dismiss on the grounds of the lack of credibility because a second jury was not going to believe the informant. Well, maybe you want to speak to the materiality then because it seems that there was quite a bit of evidence here of various sales at different points in time, large numbers of firearms. So even assuming what you're saying is true on the first half of the analysis, how do you get past the materiality prong? It's clearly material because this was an ATF sting operation and the defense was entrapment. And because the government failed to disclose a ton of information about the defendant, Mr. Rayner and Mr. Buehler, who was one of the trial counselors, could not conduct the kind of investigation that the United States Supreme Court says a defense attorney must do in order to make sound strategic decisions about how to best advocate on behalf of their client. So going into the case, they did not know the truth about this informant. They didn't really know anything about the truth about this whole story. And in fact, if we go back into the evidence that I discovered regarding the agents who testified in that federal case, sure, the transcripts had not been, obviously that case hadn't even taken place, but it was the same agents that testified. And what did they say about this particular street? Because in fact, the defendant in that case was charged with buying a firearm from Mr. Hilt, or getting one from Mr. Hilt. It's not a hot street. Do you mind turning to the felon possession issue? That's the one I was interested in discussing. I'm sorry, say that again, Your Honor. The felon possession issue and whether or not the error in the jury instructions was prejudicial, were harmless. I'm sorry, which issue regarding this? I'm sorry, the felon possession? Yes, okay, sir. Thank you. Yes, it was, because the statute in this case says that, and we're talking about rehab and knowing that you have to know that you were... Yeah, I definitely agree that there was an error. So I'm interested in was it harmless or not? No, it was not harmless. And the reason it's not harmless is because there was no evidence in the record that Mr. Hilt understood what the word felon meant. The word felon is not anywhere in the statute, and that the issue is whether he knew he had been convicted of a crime punishable by more than a year in prison. Let me ask you about that point, because the state court judgment, or whatever you call it in California, says that he was advised of the maximum penalty for the crime. And it seems to me, the government argues, and I don't see a good argument to the contrary, that at the time that the crime was committed, the maximum punishment was more than a year. Now, it doesn't say he told them it was more than a year, but isn't that enough evidence from which a jury could conclude that he knew that the punishment was more than a year? Yes. Well, the evidence that the government relied on to show that he had been advised of the maximum penalty was that docket sheet. And the docket sheet does not say what the maximum penalty is. We have no idea what Mr. Hilt was informed of, and Mr. Hilt was sentenced to 60 days in jail. Go ahead, Judge Bumate. No, Judge Bumate, go ahead. I'm sorry. I was just saying, at the time, wasn't the maximum penalty 16 months, two years, or four years? So, clearly, the maximum penalty was over 12 months. I'm not disagreeing with you that the maximum penalty was more than that. We're talking about what Mr. Hilt knew and understood. That's the issue. And Mr. Hilt, remember, he's learning disabled, and he only got 60 days in jail. And a suspended sentence. Do you know how long his suspended sentence was? I believe he had two or three years of probation. That's usually standard in the state of California. He got 60 days in jail, and he certainly didn't do all that 60 days. They usually let them out much quicker than that. It's the same thing. Usually, with a suspended sentence, you get either the minimum 16 months, and then you serve 60 days in jail. Is that what happened here? Right, but the judge, if I recall correctly, it was just 60 days of county jail time plus probation. It wasn't a felony sentence where you would go to state prison and suspended. And the issue, I think, is what he understood and what he knew. But didn't he acknowledge? I thought he said on at least one, maybe two occasions, that he knew he was not supposed to have guns. I'm sorry, could you say that again? I thought he knew. I thought he said on at least once, if not twice, that he knew. He told officers he was aware that he was not supposed to have guns. So when you add that to the prior conviction, why isn't that sufficient? Because when Mr. Hilt said, you know, I'm a felon, and he admitted that he was a felon, and the informant also said, I'm a felon too, I want to emphasize that the word felon. This is a word that we use all the time, but how many people really know that technically a felon means it's somebody, not just somebody with a criminal conviction, but somebody who was convicted of a crime punishable by more than a year in prison? I mean, most people don't even know that. I mean, probably a lot of lawyers don't even know that. And that's the issue. Not whether I'm a felon or you're a felon or he's a felon. The word felon does not appear anywhere. So how does the government make its case in a case like this where the defendant doesn't take the stand? In other words, you can't ask the defendant, what do you understand the word felon to mean? He's used it and said, I'm a felon. I can't possess firearms. I understand that. How does the government prove his understanding other than through his own mouth? Well, you know, the government, perhaps what the government could have done, and I'm just speculating here because I'm not saying I wouldn't challenge it later on, but what the government could have done is they get the transcript of the advisement at the guilty plea. Did they get the transcript of the sentence? No, they did not. And I think that we're going back because rehash is a game changer here. Right, but we're reviewing for clear error. Do you agree? I'm sorry? Since no objection was made below to the instructions, at least as to the instructions, we're reviewing for clear error. Yes, I agree. I did say that, and I concede that that is plain error because there was no objection to the instructions, but there certainly was an objection to the sufficiency of the evidence, and I think it goes hand-in-hand here. Could the judge have given a jury instruction saying that a felon means someone convicted of a crime over one year? There was, you know, I don't have it in front of me and I apologize. There was, in front of the two instructions, one about the informant's status and one about the defendant's status, and one of them did track the language, you know, punishable by more than a year in prison, and the other one, I think, said felon. But the government did not put on any evidence that the ordinary person who speaks the English language would understand that that's what a felon means, and I think that's critical here. But the judge couldn't instruct the jury as a matter of law? I'm sorry, could the judge instruct it as a matter of law that a felony means, you know, a crime with a maximum sentence over one year? I do not believe that he did. He didn't, but could he have? You know, if he did, I can stand corrected, but I don't recall that the judge instructed the jury on that specific point. I think, you know, that's why rehab is a game changer, and that's why, you know, this U.S. Supreme Court talks about textual limits, but let's read what the text says, and that's what the statute says, and the word felon does not appear. You've got a couple of minutes over, Ms. Wiefeld. I did, I did. That's okay. It's always difficult dividing argument. I'll give the appellants a couple of minutes at the end for rebuttal, even though you've gone over. And why don't we hear from the government now? Good afternoon. May it please the Court. Veronica Dragolin on behalf of the United States. And I'd like to start by jumping in on the first set of arguments from Defendant Alexander regarding the sufficiency of the evidence in this case with respect to conviction for dealing in firearms without a license, and in the related argument, which is that that statute is unconstitutional as applied to the facts of this case. And I think the court here, Judge Hurwitz and Judge Bumate, really zeroed in on the issue, which is, this is a fact question for a jury to decide. There is no question here that the jury was properly instructed on the law. The law is very specific. There's a statute defining what it means to deal in the business of selling firearms. No one doubts that there was sufficient evidence that he was in the business, but it's the word regular that he's focusing on. So is there a legal bound to the word regular? Let's assume a defendant sold a gun in year one and sold another gun in year five. Would that be a regular course of business? I think it would be a question for a jury, as long as they are properly instructed on what it means. But as a matter of law, is there some boundary? If the two transactions are 40 years apart and the jury is properly instructed, would we allow a conviction to stand? I agree that 40 years apart, absolutely not. Now that we're bargaining, tell me why four transactions in six months is a regular course of business. Sure. It was 17 guns sold to the same customer over the course of five months. Contrary to what a defense counsel argues here in terms of there was no evidence of any other dealing, there was evidence. There was text message evidence with respect to defendant Alexander's own words, and he was repeatedly advertising guns for sale that he had for the informant. He advertised additional guns and made clear that he was selling to other people, because sometimes he'd say, I have four guns for sale, oh, now they're gone, no longer available. He made clear that he had different suppliers for guns. He went to both his co-defendant, Jamie Thomas, to get some guns, who was bringing them from Arizona. But for one of the transactions, he showed up with four guns that he sold to the informant, and he got those from a different supplier. So we're talking about not just the fact that there were four transactions. The jury was asked to decide whether the conduct over this period of time that was charged falls within the spectrum of what the law considers regular course of business. And here the evidence did show that. The defendants were sophisticated and knew about the prices of the guns. They themselves set the prices. They negotiated with the informant about prices here and there. They were worried about making their customer wait. And what we're really talking about is, as Judge Hurwitz, I believe, pointed out, that what was charged here was conspiracy to deal in firearms, and it involved three defendants. And so really the fully charged crime here was a conspiracy that involved seven gun transactions, 30 guns total, to the same repeat buyer over and over. Ms. Straglin, can I ask you about the Brady claim? Sure. Not to change topics too severely, but I did want you to respond to the other side on that one because they make a lot of arguments about not having enough information about the informant. They claim that that would have made a difference. They say the informant was presented as someone who was essentially a do-gooder in the neighborhood when that wasn't true. Can you go ahead and just address those points? Yes, absolutely. And on that point, I would like to start with the point that I agree with defense on, which is that the government has a duty to look for evidence impacting the credibility of its criminal informant. Absolutely, the government has that duty. And I also agree that that duty applies even if the information is in the possession of non-federal law enforcement agencies. And so what was done in this case is that as the discovery letters, which are included in the record, make clear, the government went to the LAPD to review LAPD files about this informant and reviewed the information that was in those files. The government went to the FBI, which had no involvement in these transactions, to review the FBI files. The government reviewed the ATF files for this informant and then made disclosures about information relevant from those files. Those disclosures included the fact that this informant had been working as an informant for LAPD since 2004. So at the time of trial, he had been a professional informant pretty much for 12 years. He had worked with various numerous law enforcement agencies, and obviously in the Los Angeles area since he was working with the LAPD. And so the notion that somehow the government suppressed the fact that the informant quote, regularly set people up is simply not true. The government disclosed that he was an informant and had repeatedly worked with the government with both state and federal agencies. I'm sorry. One of the problems with Zoom was we ended up talking. So finish, and then let me ask my question, if you were done. None of the information was suppressed. Well, Ms. Weefault says what I didn't know, or what trial counsel didn't know, is that this informant had just testified in a state court proceeding, and we didn't know what he said in that state court proceeding because we didn't know his name. Now, at some point they find out his name, but focus on that. When was the state court proceeding disclosed? What was disclosed? Help me on that issue. Sure. The first reference to the fact that this informant had testified in a LAPD case in state court was made 18 days before the defendant's trial began. So 18 days prior, the government disclosed that the informant testified in an LAPD case. And then at that same time, the government disclosed that it had reviewed the LAPD file and that that file did not contain any information suggesting that this informant had ever provided false or misleading information. So I do want to talk about the hypothetical situation in which, let's say, the informant had testified falsely, and let's say there were negative credibility findings made by a judge, which there absolutely were not in this state court case. Something like that would be reflected in the LAPD file. What if the informant testified truthfully in the state court proceedings, but the information in his testimony would be useful to the defense? And I don't know. Assume that's a fact for a moment in this case. Would you have an obligation to disclose that? Not just that he did something untruthful, but that he said something there that might be useful to the defendants in this case. It depends on whether the government knew that information. And I think one of the very important facts here is defense concedes that these transcripts were not even created until she requested them for purposes of this appeal, and so there's no indication here that the government knew what was testified about. If, for some reason, it got to the court. But the LAPD did know what was testified about, and they were part of this task force. So why aren't you held to their knowledge? And I do agree that the government has an obligation to ask those questions. And as the discovery letters here made clear, when the government made its disclosure about that state court case, it was based on the review of the LAPD file, but also based on conversations with the LAPD handler, Detective Scheer, who the defense points out to. And so the government went beyond just disclosing what it found in the record. The prosecutors here spoke to the handler, who handled this informant for a period of 12 years, and learned relevant information that it had a duty to learn, and disclosed that information to the defense. There was nothing here that was withheld, and after years now that the defense has had an opportunity to dig through records, the defense has not been able to come up with anything that points to the fact that this informant somehow testified untruthfully at defendant Hill's trial, in the state court case. The defense counsel here continues to misrepresent what happened in the state court case. And frankly, we have those transcripts. The court can read what the state court found. This case was not dependent on just a C.I.'s testimony. The defendant in that case was identified by three law enforcement officers, as well as the informant. And so to say that the case was thrown out because of credibility issues with the informant is just absolutely not true. And so when putting that into context, as this court has recognized, the government does not have a duty to create documents under Brady. And in this particular case, in terms of state court transcripts from prior trials, it can't be the case that the government has a duty to go request the transcripts be created in every single case that one of its witnesses had previously testified in. Can I ask you another question about this topic? Because I'm not sure I understand it from the record. The state court case was dismissed at some point, and it was before this trial began, correct? Correct. Was that fact disclosed to the defense? That fact was not in the disclosures made to the defense. Okay. And I guess my other question has to do with the identity of the informant. It's a strange case because the defense apparently knows who the informant is. Yes, Your Honor. It is a unique case in that this informant, unlike other typical situations, lived in the neighborhood that these defendants lived in, just a few houses down. And so for many months, they knew each other. They were neighbors. They knew a lot about each other. So certain cases that are concerned with the government having an obligation to disclose an identity are concerned about making sure that the defendant knows who is this person, what do they do, where do they come from. Here, the defendants knew the informant, and so they were able to figure out. Yeah, so let me focus on the informant's name for a second. Given all that, why withhold the informant's name? At the time that this trial was going on, the informant had moved out of that neighborhood for his safety. He continued to be a productive informant with various law enforcement agencies. It was dangerous for him to be outed as an informant publicly, for his new address to be disclosed, because there was fear that he might face some type of retaliatory action from any other defendants that have been charged with crimes as a result of his work. And so there was evidence, and the circumstances were, that this informant's life had previously been threatened in connection with his work. And so the government did resist providing his name so that he couldn't be – his new address couldn't be identified, and the safety of his family could be ensured around the time of trial. And in addition to that, the government made extensive disclosures about this informant to comply with discovery obligations, and the defendants here had all of the information about this informant in terms of his prior criminal history, how much money he was paid for all the work he did, the fact that he got immigration benefits. All of those types of things were disclosed well in advance of trial. The defendants had all the information they needed. Didn't the judge order the government to disclose the name of the informant seven days before trial if the government was going to use the informant? But the government did not do that, right? They did not disclose it seven days before. That's correct. It was not seven days, because seven days before trial the government was not planning on calling the informant, in its case in chief, again, to protect his identity, to protect his safety. However, once the defense disclosed that it had now identified the name and date of birth, those same interests no longer applied since he was identified. And so at that time, which now was within a shorter window of seven days, I believe it was four days before trial, when the defense disclosed that it had identified the informant, at that time the government confirmed that was the identity and made the strategic decision to call the informant, in its case in chief, instead of letting the defense call him as a defense witness at trial. So that is the procedural sort of odd result that happened in this case. Was there any objection to this sort of, I don't want to call it a violation of the seven-day rule, but the fact that it didn't end up happening? There was no request for continuance in terms of either defendant stating that they needed more time to prepare. There was no objection raised with respect to that issue. And even with respect to the informant being able to testify using his moniker, there was no objection at trial on that issue either. And so that does color the way that this court should look at whether the government, in this case, complied with its discovery obligations and whether what the defendants received was a fair trial at the end of the day. And on the issue that I believe Judge Bress had flagged in terms of materiality, I think it is important to put into context the evidence that was presented at trial here. Every single one of these seven transactions was video and audio recorded from beginning to end. As you can see in the government's expert record, we included some trial exhibits that show a screenshot from these videos that very clearly show each defendant's face. So the video quality was extremely high. The defendants' faces were captured. They were captured counting money on video. The sound of guns were captured on video. We had text messages that showed the communications between the defendants, setting up the deals, talking about how much money they're going to make off of these deals, what types of guns to buy for this customer, sending photographs of all the guns they had offered for sale. And we had post-arrest statements by both defendants, again, recorded statements that the jury got to hear where each one admitted participating in this conduct. So taking all of that evidence together, looking at the informant's credibility, a potential issue about some state case that involved a crack cocaine sale in 2013, it's very attenuated. It has nothing to do with what these defendants were on trial for, and that information was not material. And here, that information wouldn't somehow undermine the confidence in the jury verdicts in this case, which were to find these two defendants guilty beyond a reasonable doubt of all charges. And since I see I'm low on time, I do also want to address the Rahaev issue in terms of the felony, the knowledge of a felony. As an initial matter, what the Supreme Court was concerned with in that case is that a defendant knows that he's in a prohibited class, he's not allowed to have a gun. That's the issue. You don't have to be a legal scholar who understands the legal definition of felony to be convicted of being a felon in possession of a gun. What matters is, did you know that you were not allowed to have guns? And here, as the court pointed out, the evidence in this case is that at his guilty plea, a state court judge advised the defendant of the maximum penalty for his offense. And at that time, the offense for which he was convicted was punishable by 16 months or two or three years. So clearly over one year. Do you agree that he also received a suspended sentence? Yes. And do you know what the length of the suspended sentence is? I do not know the length of the suspended sentence, but one additional fact that was clear from the exhibit that was introduced at trial is that the defendant was advised he was not allowed to possess guns, and that was in the minutes that was introduced to the jury. And the Fifth Circuit and the First Circuit have recently addressed this similar fact pattern and come to the conclusion in Huntsbury and Burggard that in a situation where a judge advises the defendant of the maximum penalty, that satisfies the concern that the Supreme Court had for Hyatt. Can I ask you about that? In those cases, was there evidence that the judge actually told the defendant that the maximum penalty was more than a year, or were we inferring that from the state statutory scheme? I believe I don't have at my fingertips which case was which, but I do know that at least in one of the cases, one of the circuit courts that addressed that issue talked about the inference that should be drawn from the fact that a state judge would comply with the law, which is to advise defendants of maximum penalty at the time of change of plea. So at least in one of the cases, that was something that was addressed, and there was no actual transcript to show what was or wasn't advised, but a court can take judicial notice of what the maximum penalty is and can take judicial notice of the fact that a state court judge in California would advise a defendant of those things at the change of plea. Counsel, in Huntsbury, one of the factors that they looked at was the fact that he was sentenced to two years as a suspended sentence. So I'm just wondering if we have that fact here. Under California law, would the suspended sentence have to have been 16, two years, or four years, or could it have been something different, if you know? I'm sorry, Your Honor, I don't know the rules under California law on that point, but the additional fact that I do want to point to is that there was also the post-arrest admission that he was a felon and was prohibited from having anything to do with guns. What do you make of your opposing counsel's argument that lay people don't understand what felon means and it doesn't necessarily mean more than one year? Again, what the Supreme Court is concerned with is people knowing that they're prohibited. So whether you know it based on the citation to a statute or just based on that you've been advised you're not allowed to have guns, it doesn't matter. What matters is that you know you're prohibited from having guns, which the defendant held here did know. And so I see I'm out of time unless anyone has any additional questions, and we'll submit on the brief. Any of my colleagues have questions? If not, why don't we put a couple minutes on the clock for the appellants, and you can split them or use them as you see fit. Your Honor, I just have two points on rebuttal. One, let's go back to Rovario. The government had no right to refuse to disclose the name and the true identity of this informant, and the court's rejection of the defense discovery motion on that point was an abuse of discretion. Rovario specifically says if you've got an informant who is a sole participant in the offense and the defense gives entrapment, the government has to turn that information over. And the government did not do that. The government did tell you the identity or confirm the identity four days before trial, so it's a little bit different than a case in which you never learned it. No, it's not. There's no difference between that at all. Because, first of all, it was three business days before trial, and they only confirmed it because Mr. Rayner finally, after a tedious comparison of text messages and phone numbers and stuff like that, figured it out. The government then confirmed it, and it was only the next day on Friday. We've got a weekend in between. Just flip the issue here. Suppose the defense attorneys in this case had all this information, and they only start investigating or trying to get court documents three business days before trial. Would we find that that's deficient performance? Of course we would. All of this might have been avoided if the government had disclosed the true identity of the informant when they were requested, which Rovario requires them to do. Then going back to the issue regarding the felon in possession, in terms of judicial notice, yes, we can figure out what the maximum penalty was, and this, that, and the other, but the issue is what was the jury told? That's what the issue is. In any event, if there are no further questions, I will submit. Thank you. We thank all three counsel for their arguments and briefing in this case, and this case will be submitted. The court will be in recess until tomorrow. Thank you.
judges: Hurwitz, Bress, Bumatay